KAH/crh/tls      15N–0142

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| E.Z., a Minor, by his Mother And Next<br>    Friend, NICOLE BRAUN;<br>NICOLE BRAUN, Individually;<br>EDWARD ZIEMBA, Individually, | ) )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | No. |
| THE UNITED STATES OF AMERICA,<br>VHS WEST SUBURBAN MEDICAL CENTER,<br>    INC., d/b/a WEST SUBURBAN<br>    MEDICAL CENTER, a Corporation,<br>MEGHAN CHILDS, R.N., and<br>LINDA ANDRUS, R.N. | )<br>)<br>)<br>)<br>)<br>)<br>) | *PLAINTIFF DEMANDS TRIAL*<br>*BY JURY AS TO ALL DEFENDANTS*<br>*EXCEPT U.S.A.* |
| Defendants. | )<br>) | |

## COMPLAINT AT LAW

## COUNT I – MEDICAL NEGLIGENCE – U.S.A.

Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, by her attorneys, CLIFFORD LAW OFFICES, P.C., complaining of Defendant, THE UNITED STATES OF AMERICA (hereinafter "USA"), states as follows:

1.      On January 4, 2014, and at all times mentioned herein, PCC COMMUNITY WELLNESS CENTER (hereinafter "CENTER"), an Illinois Not-for-Profit Corporation, was a private entity that provided health care services to patients, which received grant money from U.S. Public Health Services pursuant to 42 U.S.C. §233(b).

1

2.　　On January 4, 2014, and at all times mentioned herein, KELLY ELLIS, C.N.M. (hereinafter "ELLIS"), was a certified nurse midwife duly licensed to practice nurse midwifery in Illinois.

3.　　On January 4, 2014, and at all times mentioned herein, ELLIS was a duly authorized actual agent and employee of CENTER, acting within the scope of her agency and employment.

4.　　On January 4, 2014, and at all times mentioned herein, MARY PUTTMAN-KOSTECKA, M.D. (hereinafter "PUTTMANN") was a physician duly licensed to practice medicine in Illinois.

5.　　On January 4, 2014, and at all times mentioned herein, PUTTMANN was a duly authorized actual agent and employee of CENTER, acting within the scope of her agency and employment.

6.　　On January 4, 2014, and at all times mentioned herein, NATASHA DIAZ, M.D. (hereinafter "DIAZ") was a physician duly licensed to practice medicine in Illinois.

7.　　On January 4, 2014, and at all times mentioned herein, DIAZ was a duly authorized actual agent and employee of CENTER, acting within the scope of her agency and employment.

8.　　On January 4, 2014, and at all times mentioned herein, pursuant to 42 U.S.C. §233, ELLIS, PUTTMANN, and DIAZ, and each of them, were acting within the scope of their employment with a private entity that received grant money from the U.S. Public Health Services pursuant to 42 U.S.C. §233(b), and were deemed by Defendant, USA, as employees and/or agents of Defendant, USA.

9.　　On January 3, 2014, Plaintiff NICOLE BRAUN presented to WEST SUBURBAN MEDICAL CENTER (hereinafter "WEST SUBURBAN") at 39 2/7 weeks gestation.

10.　　On January 3, 2014, Plaintiff, NICOLE BRAUN, was triaged and discharged home.

11.     On January 4, 2014, at approximately 7:30 a.m., Plaintiff, NICOLE BRAUN, presented to WEST SUBURBAN with complaints of contraction pain since 2:00 a.m.

12.     On January 4, 2014, at approximately 7:53 a.m., Plaintiff, NICOLE BRAUN, was placed on an external fetal heart monitor which showed a baseline of 150 beats per minute ("bpm") with minimal variability and uterine contractions every 1.5 to 2.5 minutes.

13.     On January 4, 2014, at approximately 8:05 a.m., ELLIS performed a vaginal exam of Plaintiff, NICOLE BRAUN.

14.     On January 4, 2014, at approximately 8:05 a.m., Plaintiff, NICOLE BRAUN had uterine hyperstimulation.

15.     On January 4, 2014, at approximately 8:05 a.m., ELLIS recommended that Plaintiff, NICOLE BRAUN, be admitted to the labor and delivery unit.

16.     On January 4, 2014, between 8:32 a.m. and 9:30 a.m., Plaintiff, NICOLE BRAUN, had uterine contractions approximately every two minutes.

17.     On January 4, 2014, between 8:32 a.m. and 9:30 a.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at 135-140 bpm baseline with moderate variability with subtle late decelerations.

18.     On January 4, 2014, between 10:54 a.m. and 1:30 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline between 135-145 bpm with minimal to moderate variability.

19.     On January 4, 2014, at approximately 1:47 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor decelerated to 70 bpm for twenty seconds in association with a uterine contraction, before returning to a baseline of 135-140 bpm.

20.     On January 4, 2014, at approximately 3:17 p.m., Plaintiff, NICOLE BRAUN's membranes ruptured.

21.     On January 4, 2014, shortly after 3:17 p.m., ELLIS conducted a vaginal exam of Plaintiff, NICOLE BRAUN, which showed she was 8 cm dilated and one-hundred percent effaced.

22.     On January 4, 2014, by 3:58 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor showed persistent, late decelerations.

23.     On January 4, 2014, at approximately 5:41 p.m., Plaintiff, NICOLE BRAUN, began pushing.

24.     On January 4, 2014, at approximately 6:05 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline of 145 bpm with no accelerations and increasingly deep, late decelerations with almost all contractions.

25.     On January 4, 2014, between 6:05 p.m. and 7:41 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor had variable decelerations with the majority of contractions.

26.     On January 4, 2014, between 6:05 p.m. and 7:41 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was between 145 and 175 bpm.

27.     On January 4, 2014, at approximately 6:38 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor began demonstrating a progressively increasing baseline with overshoots.

28.     On January 4, 2014, by 7:54 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline of 180 bpm, which decreased to 150 bpm between uterine contractions.

29.     On January 4, 2014, at approximately 8:11 p.m., ELLIS and PUTTMANN, and each of them, discussed NICOLE BRAUN's plan of care, and decided that she should continue pushing rather than take her emergently to the operating room.

30.     On January 4, 2014, MEGHAN CHILDS, R.N., noted that the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was tachycardic.

31.     On January 4, 2014, at approximately 8:34 p.m., PUTTMANN and DIAZ decided to perform a cesarean section, removed Plaintiff, NICOLE BRAUN from the fetal heart rate monitor and transported her to the operating room.

32.     On January 4, 2014, after 8:34 p.m., the fetal heart rate monitor was not reapplied in the operating room before surgery.

33.     On January 4, 2014, DIAZ determined that E.Z. was in the right occiput anterior position.

34.     On January 4, 2014, DIAZ and PUTTMANN twice attempted "rectal assistance" for delivery of Plaintiff, NICOLE BRAUN's fetus followed by a primary low transverse cesarean section.

35.     On January 4, 2014, at approximately 9:10 p.m., E.Z. was delivered.

36.     On January 4, 2014, and at all times mentioned herein, ELLIS, had the duty to possess and apply the knowledge and use the skill and care ordinarily used by reasonably careful certified nurse midwives under similar circumstances.

37.     On January 4, 2014, CENTER, through its actual agent and employee, ELLIS, was professionally negligent in the following ways:

    a.      did not accurately assess fetal heart tracings;

    b.      did not recognize fetal distress;

5

      c.      did not appreciate the significance of non-reassuring strips;

      d.      did not notify the physician of an abnormal fetal heart rate tracing;

      e.      did not recognize a hyperstimulated uterine contraction pattern;

      f.      did not take action to reduce the frequency of uterine contractions;

      g.      did not administer terbutaline;

      h.      did not activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

      i.      did not activate the chain of command for timely cesarean section;

      j.      did not object to rectal assistance procedure without monitoring and advocating for immediate cesarean section; and

      k      did not document in the chart from 15:25 through 23:30.

38. On January 4, 2014, and at all times mentioned herein, PUTMANN and DIAZ, had the duty to possess and apply the knowledge and use the skill and care ordinarily used by reasonably careful physicians under similar circumstances.

39. On January 4, 2014, CENTER, through its actual agent and employee, PUTTMANN, was professionally negligent in the following ways:

      a.      did not oversee the labor of Nicole Braun;

      b.      did not make the decision for a cesarean section before 8:34 p.m.;

      c.      did not perform a timely cesarean section after the decision;

      d.      did not have the fetal monitor reapplied in the operating room;

      e.      performed a rectal assistance procedure without monitoring; and

      f.      further delayed delivery to perform rectal assistance.

40. On January 4, 2014, CENTER, through its actual agent and employee, DIAZ, was professionally negligent in the following ways:

a.   did not oversee the labor of Nicole Braun;

b.   did not make the decision for a cesarean section before 8:34 p.m.;

c.   did not perform a timely cesarean section after the decision;

d.   did not have the fetal monitor reapplied in the operating room;

e.    performed a rectal assistance procedure without monitoring; and

f.   further delayed delivery to perform rectal assistance.

41.   As a direct and proximate result of the aforesaid negligent acts or omissions, Plaintiff's minor, E.Z., sustained injuries of a personal and pecuniary nature.

42.   On January 4, 2016, Plaintiff, NICOLE BRAUN, filed an administrative tort claim with the appropriate agency of Defendant, USA, the Department of Health & Human Services (HHS), with the Standard Form 95.

43.   On October 14, 2016, the Department of Health and Human Services denied Plaintiffs' administrative claim and this cause is filed within six months of that denial pursuant to 28 U.S.C. §2401(b).

44.   This Court has original jurisdiction over this cause pursuant to 28 U.S.C. §1346(b)(1).

45.   Attached to this Complaint are the attorney's affidavit and physician reports required by 735 ILCS 5/2-622 of the Illinois Code of Civil Procedure.

WHEREFORE, Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, demands judgment against Defendant, THE UNITED STATES OF AMERICA, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

## COUNT II – FAMILY EXPENSE ACT – U.S.A.

1-45. Plaintiff, NICOLE BRAUN, Individually, re-asserts and re-alleges Paragraphs 1 through 45 of Count I of this Complaint, as if fully set forth herein.

46. On January 4, 2014, and at all times mentioned herein, Plaintiff, NICOLE BRAUN, was the mother of E.Z., a Minor.

47. As a direct and proximate result of the aforesaid negligent acts or omissions of Defendant, THE UNITED STATES OF AMERICA, Plaintiff, NICOLE BRAUN, as the mother of E.Z., a Minor, became obligated for various hospital and medical expenses under the Family Expense Act, 750 ILCS 65/15, and brings this action to recover said expenses.

WHEREFORE, Plaintiff, NICOLE BRAUN, Individually, demands judgment against Defendant, THE UNITED STATES OF AMERICA, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

## COUNT III – FAMILY EXPENSE ACT – U.S.A.

1-45. Plaintiff, EDWARD ZIEMBA, Individually, re-asserts and re-alleges Paragraphs 1 through 45 of Count I of this Complaint, as if fully set forth herein.

46. On January 4, 2014, and at all times mentioned herein, Plaintiff, EDWARD ZIEMBA, was the father of E.Z., a Minor.

47. As a direct and proximate result of the aforesaid negligent acts or omissions of Defendant, THE UNITED STATES OF AMERICA, Plaintiff, EDWARD ZIEMBA, as the father of E.Z., a Minor, became obligated for various hospital and medical expenses under the Family Expense Act, 750 ILCS 65/15, and brings this action to recover said expenses.

WHEREFORE, Plaintiff, EDWARD ZIEMBA, Individually, demands judgment against Defendant, THE UNITED STATES OF AMERICA, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

## COUNT IV – MEDICAL NEGLIGENCE –
## VHS WEST SUBURBAN MEDICAL CENTER

Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, by her attorneys, CLIFFORD LAW OFFICES, P.C., complaining of Defendant, VHS WEST SUBURBAN MEDICAL CENTER, INC. d/b/a WEST SUBURBAN MEDICAL CENTER (hereinafter "WEST SUBURBAN"), MEGHAN CHILDS, R.N. (hereinafter "CHILDS"), and LINDA ANDRUS, R.N. (hereinafter "ANDRUS"), states as follows:

1.      On or about January 4, 2014, and at all times mentioned herein, Defendant, WEST SUBURBAN, was a duly licensed health care institution providing medical treatment to patients therein.

2.      On or about January 4, 2014, and at all times mentioned herein, Defendant, WEST SUBURBAN, held itself out as a health care institution which provided complete medical care to its patient, including complete pre-natal and neonatal care.

3.      On or about January 4, 2014, and at all times mentioned herein, Defendant, ANDRUS, was registered nurse duly licensed to practice in Illinois.

4.      On or about January 4, 2014, and at all times mentioned herein, Defendant, ANDRUS, was a duly authorized agent and/or employee of Defendant, WEST SUBURBAN, acting within the scope of her agency and employment.

5.      Pleading in the alternative, on or about January 4, 2014, and at all times mentioned herein, Defendant, ANDRUS, was an apparent agent of Defendant, WEST SUBURBAN, upon whom Plaintiffs justifiably and reasonably relied.

9

6.     Pleading in the alternative, on or about January 4, 2014, Defendant, WEST SUBURBAN, failed to inform Plaintiff, NICOLE BRAUN, that Defendant, ANDRUS was an independent contractor.

7.     On or about January 4, 2014, and at all times mentioned herein, Defendant, CHILDS, was registered nurse duly licensed to practice in Illinois.

8.     On or about January 4, 2014, and at all times mentioned herein, Defendant, CHILDS, was a duly authorized agent and/or employee of Defendant, WEST SUBURBAN, acting within the scope of her agency and employment.

9.     Pleading in the alternative, on or about January 4, 2014, and at all times mentioned herein, Defendant, CHILDS, was an apparent agent of Defendant, WEST SUBURBAN, upon whom Plaintiff justifiably and reasonably relied.

10.     Pleading in the alternative, on or about January 4, 2014, Defendant, WEST SUBURBAN, failed to inform Plaintiff, NICOLE BRAUN, that Defendant, CHILDS, was an independent contractor.

11.     On January 3, 2014, Plaintiff NICOLE BRAUN presented to WEST SUBURBAN at 39 and 2/7 weeks gestation.

12.     On January 3, 2014, Plaintiff, NICOLE BRAUN, was triaged and discharged home.

13.     On January 4, 2014, at approximately 7:30 a.m., Plaintiff, NICOLE BRAUN, presented to WEST SUBURBAN with complaints of contraction pain since 2:00 a.m.

14.     On January 4, 2014, at approximately 7:53 a.m., Plaintiff, NICOLE BRAUN, was placed on an external fetal heart monitor which showed a baseline of 150 beats per minute ("bpm") with minimal variability and uterine contractions every 1.5 to 2.5 minutes.

15. On January 4, 2014, at approximately 8:05 a.m., KELLY ELLIS, CNM (hereinafter "ELLIS") performed a vaginal exam of Plaintiff, NICOLE BRAUN.

16. On January 4, 2014, at approximately 8:05 a.m., Plaintiff, NICOLE BRAUN had uterine hyperstimulation.

17. On January 4, 2014, at approximately 8:05 a.m., ELLIS recommended that NICOLE BRAUN be admitted to the labor and delivery unit.

18. On January 4, 2014, at approximately 8:24 a.m., Defendant, ANDRUS assumed the nursing care and treatment of NICOLE BRAUN.

19. On January 4, 2014, between 8:32 a.m. and 9:30 a.m., Plaintiff, NICOLE BRAUN, experienced uterine contractions approximately every two minutes.

20. On January 4, 2014, between 8:32 a.m. and 9:30 a.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at 135-140 bpm baseline with moderate variability with subtle late decelerations.

21. On January 4, 2014, between 10:54 a.m. and 1:30 p.m., the fetal heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline between 135-145 bpm with minimal to moderate variability.

22. On January 4, 2014, at approximately 1:47 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor decelerated to 70 bpm for a period of twenty seconds followed by a uterine contraction, before returning to a baseline of 135-140 bpm.

23. On January 4, 2014, at approximately 3:17 p.m., Plaintiff, NICOLE BRAUN's membranes ruptured.

24. On January 4, 2014, shortly after 3:17 p.m., ELLIS conducted a vaginal exam of Plaintiff, NICOLE BRAUN, which showed she was 8 cm dilated and one-hundred percent effaced.

25.    On January 4, 2014, by 3:58 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor showed persistent, late decelerations.

26.    On January 4, 2014, at approximately 5:41 p.m., Plaintiff, NICOLE BRAUN, began pushing.

27.    On January 4, 2014, at approximately 5:46 p.m., Defendant, ANDRUS reviewed with NICOLE BRAUN the position and technique for pushing.

28.    On January 4, 2014, at approximately 6:05 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline of 145 bpm with no accelerations and increasingly deep, late decelerations with almost all contractions.

29.    On January 4, 2014, between 6:05 p.m. and 7:41 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor showed variable decelerations with the majority of contractions.

30.    On January 4, 2014, between 6:05 p.m. and 7:41 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was recorded between 145 and 175 bpm.

31.    On January 4, 2014, at approximately 6:38 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor began demonstrating a progressively increasing baseline with overshoots.

32.    On January 4, 2014, at approximately 7:08 p.m., there was a nursing shift change, at which point Defendant, CHILDS, assumed the nursing care of NICOLE BRAUN.

33.    On January 4, 2014, by 7:54 p.m., the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was at a baseline of 180 bpm, which decreased to 150 bpm between uterine contractions.

34. On January 4, 2014, CHILDS, noted the heart rate of Plaintiff, NICOLE BRAUN's fetus as shown on the monitor was tachycardic.

35. On January 4, 2014, at approximately 8:34 p.m., MARY PUTTMANN-KOTECKA, M.D. (hereinafter "PUTTMANN") and NATASHA DIAZ, M.D. (hereinafter "DIAZ"), and each of them, decided to perform a cesarean section, removed Plaintiff, NICOLE BRAUN from the fetal heart rate monitor and transported her to the operating room.

36. On January 4, 2014, after 8:34 p.m., the fetal heart rate monitor was not reapplied in the operating room before surgery.

37. On January 4, 2014, DIAZ determined that E.Z. was in the right occiput anterior position.

38. On January 4, 2014, at approximately 9:10 p.m., E.Z. was delivered.

39. On January 4, 2014, and at all times mentioned herein, ANDRUS had the duty to possess and apply the knowledge and use the skill and care ordinarily used by reasonably careful registered nurses under similar circumstances.

40. On January 4, 2014, Defendant, WEST SUBURBAN, through its actual agent and employee, ANDRUS., was professionally negligent in the following ways:

    a. did not accurately assess fetal heart tracings;

    b. did not communicate abnormal fetal heart findings in a timely manner;

    c. did not properly assess fetal well-being;

    d. did not activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

    e. did not notify a physician of persistent, late decelerations;

    f. did not recognize a hyperstimulated uterine contraction pattern;

    g. did not take action to reduce the frequency of uterine contractions; and

        h.     did not administer terbutaline.

41.     On January 4, 2014, and at all times mentioned herein, CHILDS, had the duty to possess and apply the knowledge and use the skill and care ordinarily used by reasonably careful registered nurses under similar circumstances.

42.     On January 4, 2014, Defendant, WEST SUBURBAN, through its actual agent and employee, CHILDS, was professionally negligent in the following ways:

        a.     did not accurately assess fetal heart tracings;

        b.     did not communicate abnormal fetal heart findings in a timely manner;

        c.     did not properly assess fetal well-being;

        d.     did not activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

        e.     did not notify a physician of persistent, late decelerations;

        f.     did not recognize a hyperstimulated uterine contraction pattern;

        g.     did not take action to reduce the frequency of uterine contractions;

        h.     did not administer terbutaline;

        i.     did not activate the chain of command to advocate for a timely cesarean section.

43.     As a direct and proximate result of the aforesaid negligent acts or omissions, E.Z., a minor, sustained injuries of a personal and pecuniary nature.

44.     Supplemental jurisdiction is properly in this Court as the Court has original jurisdiction over the claims pled in Counts I, II and III against Defendant, THE UNITED STATES OF AMERICA, and because the claim of this Count IV is so related to the claims in Count I, II and III that they form part of the same case in controversy under 28 U.S.C. § 1367.

45. Attached to this Complaint at Law are the attorney's affidavit and physician reports required by 735 ILCS 5/2-622 of the Illinois Code of Civil Procedure.

WHEREFORE, Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, demands judgment against Defendants, VHS WEST SUBURBAN MEDICAL CENTER, INC. d/b/a WEST SUBURBAN MEDICAL CENTER, MEGHAN CHILDS, R.N., and LINDA ANDRUS, R.N., and each of them, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

## COUNT V – FAMILY EXPENSE ACT –
## VHS WEST SUBURBAN MEDICAL CENTER

1-45. Plaintiff, NICOLE BRAUN, Individually, re-asserts and re-alleges Paragraphs 1 through 45 of Count IV of this Complaint, as if fully set forth herein.

46. On January 4, 2014, and at all times mentioned herein, Plaintiff, NICOLE BRAUN, was the mother of E.Z., a Minor.

47. As a direct and proximate result of the aforesaid negligent acts or omissions of Defendant, WEST SUBURBAN, through its actual agents and employees, ANDRUS and CHILDS, Plaintiff, NICOLE BRAUN, as the mother of E.Z., a Minor, became obligated for various hospital and medical expenses under the Family Expense Act, 750 ILCS 65/15, and brings this action to recover said expenses.

WHEREFORE, Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, demands judgment against Defendants, VHS WEST SUBURBAN MEDICAL CENTER, INC. d/b/a WEST SUBURBAN MEDICAL CENTER, MEGHAN CHILDS, R.N., and LINDA ANDRUS, R.N., and each of them, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

## COUNT VI – FAMILY EXPENSE ACT –
## VHS WEST SUBURBAN MEDICAL CENTER

1-45.    Plaintiff, EDWARD ZIEMBA, Individually, re-asserts and re-alleges Paragraphs 1 through 45 of Count IV of this Complaint, as if fully set forth herein.

46.    On January 4, 2014, and at all times mentioned herein, Plaintiff, EDWARD ZIEMBA, was the father of E.Z., a Minor.

47.    As a direct and proximate result of the aforesaid negligent acts or omissions of Defendant, WEST SUBURBAN, through its actual agents and employees, ANDRUS and CHILDS, Plaintiff, EDWARD ZIEMBA, as the father of E.Z., a Minor, became obligated for various hospital and medical expenses under the Family Expense Act, 750 ILCS 65/15, and brings this action to recover said expenses.

WHEREFORE, Plaintiff, E.Z., a Minor, by his Mother and Next Friend, NICOLE BRAUN, demands judgment against Defendants, VHS WEST SUBURBAN MEDICAL CENTER, INC. d/b/a WEST SUBURBAN MEDICAL CENTER, MEGHAN CHILDS, R.N., and LINDA ANDRUS, R.N., and each of them, in an amount in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000.00).

By:  _s/ Keith A. Hebeisen_____
KEITH A. HEBEISEN
Attorney for Plaintiffs
CLIFFORD LAW OFFICES, P.C.
120 N. LaSalle Street, Suite 3100
Chicago, Illinois 60602
312/899-9090
KAH@cliffordlaw.com

KAH/tls          15N–0142

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| E.Z., a Minor, by his Mother And Next | ) | |
|     Friend, NICOLE BRAUN; | ) | |
| NICOLE BRAUN, Individually; | ) | |
| EDWARD ZIEMBA, Individually, | ) | |
| | ) | |
|         Plaintiffs, | ) | |
| | ) | |
|         v. | ) | No. |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| VHS WEST SUBURBAN MEDICAL CENTER, | ) | |
|     INC., d/b/a WEST SUBURBAN | ) | |
|     MEDICAL CENTER, a Corporation, | ) | |
| MEGHAN CHILDS, R.N., and | ) | |
| LINDA ANDRUS, R.N. | ) | |
| | ) | |
|         Defendants. | ) | |

**PLAINTIFFS' ATTORNEY AFFIDAVIT PURSUANT TO 735 ILCS 5/2-622(a)(1)**

KEITH A. HEBEISEN states as follows:

1.     I am one of the attorneys with responsibility for this matter on behalf of the

Plaintiffs.

2.     I have consulted and reviewed the facts of this case with health professionals

whom I reasonably believe: (i) are knowledgeable in the relevant issues involved in this

particular action; (ii) practice or have practiced within the last six (6) years or teach or have

taught within the last six (6) years in the same area of health care or medicine that is at issue in

this particular action; and (iii) are qualified by experience or demonstrated competence in the

subject of this case.

3.      The reviewing health professionals have determined in written reports after review of the medical records and other relevant material involved in this particular action that there is a reasonable and meritorious cause for the filing of this action against THE UNITED STATES OF AMERICA, MARY PUTTMANN, M.D., NATESHA DIAZ, M.D., KELLY ELLIS, C.N.M., VHS WEST SUBURBAN MEDICAL CENTER, INC., d/b/a WEST SUBURBAN MEDICAL CENTER, MEGHAN CHILDS, R.N. and LINDA ANDRUS, R.N.

4.      I have concluded on the basis of the reviewing health professionals' review and consultation that there is a reasonable and meritorious cause for filing of this action against THE UNITED STATES OF AMERICA, MARY PUTTMANN, M.D., NATESHA DIAZ, M.D., KELLY ELLIS, C.N.M., VHS WEST SUBURBAN MEDICAL CENTER, INC., d/b/a WEST SUBURBAN MEDICAL CENTER, MEGHAN CHILDS, R.N. and LINDA ANDRUS, R.N.

5.      Copies of the written reports are attached.

FURTHER AFFIANT SAYETH NOT.

s/ Keith A. Hebeisen
Attorney for Plaintiffs
CLIFFORD LAW OFFICES, P.C.
120 North LaSalle Street
Suite 3100
Chicago, Illinois 60602
(312) 899-9090

[X]     Under penalties as provided by law pursuant to 735 ILCS 5/1-109 of the Code of Civil Procedure, I certify that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that I verily believe the same to be true.

2

Keith A. Hebeisen, Esq.
Clifford Law Offices, P.C.
120 North LaSalle, Suite 3100
Chicago, Illinois 60602

Re _____ DOB: _____

Dear Mr. Hebeisen:

I am a physician licensed to practice medicine in all of its branches. I am knowledgeable in the relevant issues involved in this particular action. I have practiced within the last 6 years in the same area of healthcare that is at issue in this action and have substantial experience in the practice of maternal fetal medicine. I am familiar with the relevant literature and guidelines applicable to the subject matter in this case. I am qualified by experience and demonstrated competence in the subject of this case. I have reviewed the medical records of Nicole Braun and _____ including but not limited to records from West Suburban Medical Center (mom & baby), PCC Wellness Austin Clinic and Rush University Medical Center Discharge Summary.

The opinions stated herein are based upon a reasonable degree of medical certainty based upon my training, experience and my review of the aforesaid materials.

### Medical Summary

On January 3, 2014, in her 39 weeks and 2 days of pregnancy, Nicole Braun presented to West Suburban Hospital with contractions and complaining of decreased fetal movement. She was triaged and sent home. Her stress test was nonreactive and she was sent for a biophysical profile. There is no documentation whether there was any consult with an Ob/GYB or MFM at this time.

On January 4, 2014, Nicole Braun presented to West Suburban Medical Center at approx. 7:30 AM with complaints of contraction pain since 2AM. At 7:53AM she was placed on an external fetal heart monitor which showed a baseline of 150 bpm with minimal variability and uterine contractions every 1.5 to 2.5 minutes. The strip was positive for an acceleration to 165.

At 8:05 AM, Kelly Ellis, a Certified Nurse Midwife was at bedside. Following a vaginal exam: 4cm, 90% effaced, -2 station, ROM bulging. CNM Ellis recommended admission to the labor and delivery unit. At that time, Nicole's uterine contraction pattern was hyper-stimulated and required close watching by CNM Ellis.

1

At 8:24 AM, Linda Andrus, R.N., noted Nicole Braun had complained of intense and irregular contractions since 2:00 AM. Nurse Andrus requested an epidural, but needed to wait to administer it until she received the results of Braun's complete blood count (CBC) because Braun's white blood count upon admission was slightly elevated measuring 19.1.

Between 8:32 AM and 9:30 AM, Nicole Braun experienced uterine contractions approximately every two minutes. Fetal heart rate monitors continued to read 135-140 bpm baseline with moderate variability with subtle late decelerations.

Between 10:54 AM and 1:30 PM, the fetal heart monitor showed a baseline between 135-145 bpm with minimal to moderate variability. At approximately 1:47 PM, the rate decelerated to 70 bpm for a period of 20 seconds followed by a uterine contraction, before returning to the baseline of 135-140 bpm, where it remained through 2:30 PM.

At 3:17 PM Nicole Braun's membranes ruptured. A vaginal exam conducted by Kelly Ellis, CNM, showed Braun was 8 cm dilated and 100% effaced. Meconium was noted at that time. At 4:20 PM the fetal heart monitor indicated a baseline of 150 bpm with minimal to moderate variability and uterine contractions every 2 minutes with late decelerations with the majority of contractions. The fetal heart rate decelerated to 125 bpm over one minute with a gradual return to baseline. By 3:58 PM Nicole was showing a pattern with persistent late decelerations

An oxygen mask was applied. At 5:46 PM Nurse Andrus reviewed the position and technique for pushing. At 5:41 PM, Braun began pushing. By 6:05 PM the fetal heart rate had a baseline of 145 bpm with no accelerations and increasingly deep late decelerations with almost all contractions.

Between 6:05 PM and 7:41 PM, there were persistent variables decelerations with the majority of contractions. The fetal heart rate baseline was recorded as anywhere between 145-170 bpm. At 6:20 PM there was a brief demonstration of baseline between 140-150. At 6:38 PM the fetal heart began demonstrating a progressively increasing baseline with overshoots.

At 7:08 PM there was a nursing shift change. Nurse Andrus handed off Nicole's bedside nursing care to *Nurse Meghan Childs*.

At 7:14 PM the fetal heart tracing demonstrated a baseline of 170 (Page 83).

By 7:54 PM, Braun's body temperature had increased to 99.2 degrees. The fetal heart rate baseline was 180 bpm, which decreased to 150 bpm between uterine contractions. The fetus experienced accelerations with uterine contractions, and late decelerations following uterine contractions, in addition to moderate variability.

2

At 8:07 PM, Dr. Mary Puttmann was called to the patient's bedside, where she and Kelly Ellis, CNM, discussed the plan of care at 8:11 PM. They made the decision to continue pushing instead of taking Braun emergently to the operating room. By 8:20 PM, it was clear that the fetal heart rate baseline was about 180 bpm with late onset decelerations to 100-120 bpm. Nurse Childs noted that the fetal heart rate was tachycardic.

Shortly thereafter, Dr. Natasha Diaz and Dr. Mary Puttmann discussed the plan of care with Braun at 8:34 PM. It was then determined that a cesarean section was necessary. Braun was removed from the monitors and transported to the operating room. The fetal heart rate monitor was not reapplied in the operating room before surgery.

According to the operative report, Dr. Natasha Diaz suspected cephalopelvic disproportion and fetal intolerance to labor, and it was determined that baby _____ was in right occiput anterior (ROA) position. Rectal assistance for delivery of _____'s chin was attempted twice before a primary low transverse cesarean section was eventually performed. There was no fetal monitor tracing during this procedure. Attempting this rectal procedure without monitoring delayed the necessary Caesarean section. Prolonging this child's delivery without any monitoring is a violation of the standard of care.

Nicole was placed under general anesthesia, and _____ was delivered at 9:10 PM. _____'s Apgars were 2 at 1 minute, 5 at 5 minutes and 6 at 10 minutes.

As a result of the failure to deliver _____ by cesarean section earlier, he sustained severe and permanent brain damage and injuries related thereto.

It is my opinion that there is a reasonable and meritorious cause for filing an action against: 1) Mary Puttmann, M.D. 2) Natasha E. Diaz, M.D.

**Mary Puttmann, M.D.**

On January 4, 2014, Mary Puttman, M.D. was professionally negligent in the following ways:

a) failed to oversee the labor of Nicole Braun;

b) failed to make the decision for a cesarean section before 8:34 p.m.;

c) failed to perform a timely cesarean section after the decision;

d) failed to have the fetal monitor reapplied in the operating room;

e) performed a rectal assistance procedure without monitoring;

f)      further delayed delivery to perform rectal assistance.

The aforesaid negligent acts and/or omissions of Mary Puttman, M.D. were a proximate cause of injury to _____

**Natasha Diaz, M.D.**

On January 4, 2014, Natasha Diaz, M.D. was professionally negligent in the following ways:

a)      failed to oversee the labor of Nicole Braun;

b)      failed to make the decision for a cesarean section before 8:34 p.m.

c)      failed to perform a timely cesarean section after the decision;

d)      failed to have the fetal monitor reapplied in the operating room;

e)      performed a rectal assistance procedure without monitoring;

f)      further delayed delivery to perform rectal assistance.


The aforesaid negligent acts and/or omissions of Natasha Diaz, M.D. were a proximate cause of injury to _____


I have reviewed the attached report of the obstetrical nursing expert. It is my opinion that there is also a reasonable and meritorious cause for the filing of an action against Linda Andrus, R.N and Meghan Childs, R.N.

It is my opinion that if Linda Andrus, R.N. and Meghan Childs, R.N. had complied with the standard of care, a reasonably well-qualified obstetrician, if necessary through the chain of command, would have timely ordered and performed a C-section, which would have led to an earlier delivery of _____. If Nurse Andrus and/or Nurse Childs had notified a physician and they were unresponsive she should have initiated the chain of command to advocate for timely delivery. The negligent acts and/or omissions of Nurse Andrus and Nurse Childs, outlined in the attached report, were a proximate cause of injury to _____

I have also reviewed the attached report of the certified nurse midwife expert. It is my opinion that there is also a reasonable and meritorious cause for the filing of an action against Kelly Ellis, CNM.

4

It is my opinion that if Kelly Ellis, CNM had complied with the standard of care, as stated in the attached report, a reasonably well-qualified obstetrician would have timely ordered and performed a C-section, which would have led to an earlier delivery of _____ _____. If CNM Ellis had notified a physician and they were unresponsive she should have initiated the chain of command to advocate for timely delivery. The negligent acts and/or omissions of Kelly Ellis, CNM, outlined in the attached report, were a proximate cause of injury to _____ _____.

My opinions are subject to modification pending review of further materials.

5

Keith A. Hebeisen, Esq.
Clifford Law Offices, P.C.
120 North LaSalle, Suite 3100
Chicago, Illinois 60602

Re:_____, DOB: ____ ____

Dear Mr. Hebeisen:

I am a registered nurse licensed to practice nursing. I am knowledgeable in the relevant issues involved in this particular action. I have practiced within the last 6 years in the same area of healthcare that is at issue in this action and have substantial experience in bedside nursing in a labor and delivery unit.

I have reviewed the medical records of Nicole Braun and _____, including but not limited to records from West Suburban Medical Center (mom & baby), PCC Wellness Austin Clinic and Rush University Medical Center Discharge Summary.

The opinions stated herein are based upon a reasonable degree of nursing certainty based upon my training, experience and my review of the aforesaid materials.

## Medical Summary

On January 3, 2014, in her 39 weeks and 2 days of pregnancy, Nicole Braun presented to West Suburban Hospital with contractions and complaining of decreased fetal movement. Her stress test was nonreactive and she was sent for a biophysical profile. There is no documentation whether there was any consult with an Ob/GYB or MFM at this time.

On January 4, 2014, Nicole Braun presented to West Suburban Medical Center at approx. 7:30 AM with complaints of contraction pain since 2AM. At *7:53AM* she was placed on an external fetal heart monitor which showed a baseline of 150 bpm with minimal variability and uterine contractions every 1.5 to 2.5 minutes. The strip was reassuring and reactive. Confirming fetal wellbeing. The strip was positive for an acceleration to 165.

At 8:05 AM, **Kelly Ellis, a Certified Nurse Midwife** was at bedside. She found the following on vaginal exam: 4cm, 90% effaced, -2 station, ROM status was noted as bulging. CNM Ellis recommended admission to the labor and delivery unit. At that time, Nicole's uterine contraction pattern was hyper-stimulated and required close watching by CNM Ellis.

At 8:24 AM, **Linda Andrus, R.N.,** noted Nicole had complained of intense and regular contractions since 2:00 AM. (page 26 of records). Nurse Andrus requested an epidural, but needed to wait to administer it until she received the results of Braun's complete blood count (CBC). In the interim Nicole received IV fluids and IV Stadol. The fluid bolus had no impact on the contraction pattern.

1

The results of the CBC ultimately revealed that Nicole's white blood count was slightly elevated - measuring 19.1.

At 8:28 AM, the fetal heart rate was measured at a baseline of 135-140 bpm with moderate variability and a reassuring strip.

Between 8:32 AM and 9:30 AM, Nicole experienced uterine contractions approximately every two minutes. Fetal heart rate monitors continued to read 135-140 bpm baseline with moderate variability.

Nicole received her epidural at 10:08 AM. At 10:39 AM, Nicole was noted to have contractions approximately every 3 minutes, and the fetal heart monitor showed a baseline of 135-140 bpm with subtle late decelerations.

Between 10:54 AM and 1:30 PM, the fetal heart monitor showed a baseline between 135-145 bpm with minimal to moderate variability. At approximately 1:47 PM, the rate decelerated to 70 bpm for a period of 20 seconds followed by a uterine contraction, before returning to the baseline of 135-140 bpm, where it remained through 2:30 PM.

At 3:17 PM a vaginal exam conducted by Kelly Ellis, CNM, showed Nicole was 8 cm dilated, 100% effaced and the baby was at -1 station. At that time CNM Ellis artificially ruptured Nicole's membranes. A moderate amount of meconium stained fluid was noted at that time.

From 3:17 PM through 3:58 PM the fetal heart rate pattern showed evidence of placental insufficiency (early decelerations with a late return to baseline and/or late decelerations) that required CNM Ellis to consult with a physician.

By 3:58 PM Nicole was showing a pattern with persistent late decelerations that required CNM Ellis to consult with a provider that can perform a cesarean section. The labor had progressed outside of a normal labor and required physician consultation.

At 4:20 PM the fetal heart monitor indicated a baseline of 150 bpm with minimal to moderate variability and uterine contractions every 2 minutes with late decelerations with the majority of contractions. The fetal heart rate decelerated to 125 bpm over 1 minute with a gradual return to baseline. An oxygen mask was applied.

At 5:46 PM Nurse Andrus reviewed the position and technique for pushing. At 5:41 PM, Nicole was instructed to start pushing.

By 6:05 PM the fetal heart rate had a baseline of 145 bpm with no accelerations and late decelerations with almost all contractions.

Between 6:05 PM and 7:41 PM, there were persistent variables decelerations with the majority of contractions. The fetal heart rate baseline was recorded as anywhere between 145-170 bpm. At 6:20 PM there was a brief demonstration of baseline between 140-150. At 6:38 PM the fetal heart began demonstrating a progressively increasing baseline with overshoots.

At 7:08 PM there was a nursing shift change. **Nurse Andrus handed off Nicole's bedside nursing care to Nurse Meghan Childs.**

At 7:14 PM the fetal heart tracing demonstrated a baseline of 170 (Page 83). Nurse Childs was required to notify a physician and activate the chain of command to advocate for a Caesarean section.

At 7:30 PM the fetal heart tracing demonstrated persistent late decelerations which continued until delivery. By 7:37PM the fetal heart tracing is ominous.

At 7:42 PM tachysystole of greater than 5 contractions in 10 minutes was noted. There is no time on the fetal hear tracing where there is not a contraction for 30 seconds.

By 7:54 PM, Nicole's body temperature was 99.2 degrees. The fetal heart rate baseline was 180 bpm, which decreased to 150 bpm between uterine contractions.

At 8:07 PM, Dr. Mary Puttmann was called to the patient's bedside, where she and Kelly Ellis, CNM discussed the plan of care at 8:11 PM. They made the negligent decision to continue pushing instead of taking Nicole emergently to the operating room. By 8:20 PM, the fetal heart rate baseline was approximately 180 bpm with late onset decelerations to 100-120 bpm.

Nurse Childs noted the tachycardia and the decelerations were variable, however, because they occurred after every uterine contraction, they were in fact not variable. They are by definition late decelerations.

Shortly thereafter, at 8:34PM, Dr. Natasha Diaz and Dr. Mary Puttmann discussed the plan of care with Nicole. Finally it was then determined that a cesarean section was necessary.

Nicole was removed from the monitors and transported to the operating room. The fetal heart rate monitor was not reapplied in the operating room before surgery.

According to the operative report, Dr. Natasha Diaz suspected cephalopelvic disproportion and fetal intolerance to labor, and it was determined that baby _____ was in right occiput anterior (ROA) position. Rectal assistance for delivery of _____'s chin was attempted twice before a primary low transverse cesarean section was eventually performed. There was no fetal monitor tracing during this procedure. Attempting this barbaric rectal procedure without monitoring delayed the necessary Caesarean section. Prolonging this child's delivery without any monitoring is a violation of the standard of care. If nurses were present in the operating room when this procedure was attempted they were required to stop the unnecessary delay, advocate for immediate Caesarean section and get their patients monitored. The rectal procedure caused nothing but harm and delay to both mother and child.

When the rectal procedure failed, Nicole was placed under general anesthesia, and_____ was delivered at 9:10 PM. `_____s Apgars were 2 at 1 minute, 5 at 5 minutes and 6 at 10 minutes. He had a cord PH of 7.0. validating that he suffered hypoxia in-utero.

As a result of the failure to deliver ı _____. by cesarean section earlier, he sustained severe and permanent brain damage and injuries related thereto.

It is my opinion that there is a reasonable and meritorious cause for filing an action against: 1) Linda Andrus, R.N. and 2) Meghan Childs, R.N.

## Linda Andrus, R.N.

On January 4, 2014, Linda Andrus, R.N. was professionally negligent in the following ways:

a)   failed to accurately assess fetal heart tracings;

b)   failed to communicate abnormal fetal heart findings in a timely manner;

c)   failed to properly assess fetal well-being;

d)   failed to activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

e)   failed to notify an physician of persistent late decelerations;

f)   failed to recognize a hyper stimulated uterine contraction pattern;

g)   failed to take action to reduce the frequency of uterine contractions; and

h)   failed to administer terbutaline.

## Meghan Childs, R.N.

On January 4, 2014, Meghan Childs, R.N. was professionally negligent in the following ways:

a)   failed to accurately assess fetal heart tracings;

b)   failed to communicate abnormal fetal heart findings in a timely manner;

c)   failed to properly assess fetal well-being;

4

d)    failed to activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

e)    failed to notify an physician of persistent late decelerations;

f)    failed to recognize a hyper stimulated uterine contraction pattern;

g)    failed to take action to reduce the frequency of uterine contractions;

h)    failed to administer terbutaline; and

i)    failed to activate the chain of command to advocate for a timely cesarean section.

My opinions are subject to modification pending review of further materials.

5

Keith A. Hebeisen, Esq.
Clifford Law Offices, P.C.
120 North LaSalle, Suite 3100
Chicago, Illinois 60602

Re _____.DOB: ___ ___ ____ _

Dear Mr. Hebeisen:

I am a registered nurse and certified nurse midwife. I am knowledgeable in the relevant issues involved in this particular action. I have practiced within the last 6 years in the same area of healthcare that is at issue in this action and have substantial experience in the practice of midwifery and nursing. I specialize in patient safety in labor and delivery. I am familiar with the relevant literature and guidelines applicable to the subject matter in this case. I am qualified by experience and demonstrated competence in the subject of this case. I have reviewed the medical records of Nicole Braun and _____ ↓, including but not limited to records from West Suburban Medical Center (mom & baby), PCC Wellness Austin Clinic and the Rush University Medical Center Discharge Summary.

The opinions stated herein are based upon a reasonable degree of nursing certainty based upon my training, experience and my review of the aforesaid materials.

## Medical Summary

On January 3, 2014, in her 39 weeks and 2 days of pregnancy, Nicole Braun presented to West Suburban Hospital with contractions and complaining of decreased fetal movement. Her stress test was nonreactive and she was sent for a biophysical profile. There is no documentation whether there was any consult with an Ob/GYB or MFM at this time.

On January 4, 2014, Nicole Braun presented to West Suburban Medical Center at approx. 7:30 AM with complaints of contraction pain since 2AM. At *7:53AM* she was placed on an external fetal heart monitor which showed a baseline of 150 bpm with minimal variability and uterine contractions every 1.5 to 2.5 minutes. The strip was reassuring and reactive. Confirming fetal wellbeing. The strip was positive for an acceleration to 165.

At 8:05 AM, Kelly Ellis, a Certified Nurse Midwife was at bedside. She found the following on vaginal exam: 4cm, 90% effaced, -2 station, ROM status was noted as bulging. CNM Ellis recommended admission to the labor and delivery unit. At that time, Nicole's uterine contraction pattern was hyper-stimulated and required close watching by CNM Ellis.

At 8:24 AM, Linda Andrus, R.N., noted Nicole had complained of intense and regular contractions since 2:00 AM. (page 26 of records). Nurse Andrus requested an epidural, but needed to wait to administer it until she received the results of Braun's complete blood count (CBC). In the interim Nicole received IV fluids and IV Stadol. The fluid bolus had no impact on the contraction pattern.

I

The results of the CBC ultimately revealed that Nicole's white blood count was slightly elevated - measuring 19.1.

At 8:28 AM, the fetal heart rate was measured at a baseline of 135-140 bpm with moderate variability and a reassuring strip.

Between 8:32 AM and 9:30 AM, Nicole experienced uterine contractions approximately every two minutes. Fetal heart rate monitors continued to read 135-140 bpm baseline with moderate variability.

Nicole received her epidural at 10:08 AM. At 10:39 AM, Nicole was noted to have contractions approximately every 3 minutes, and the fetal heart monitor showed a baseline of 135-140 bpm with subtle late decelerations.

Between 10:54 AM and 1:30 PM, the fetal heart monitor showed a baseline between 135-145 bpm with minimal to moderate variability. At approximately 1:47 PM, the rate decelerated to 70 bpm for a period of 20 seconds followed by a uterine contraction, before returning to the baseline of 135-140 bpm, where it remained through 2:30 PM.

At 3:17 PM a vaginal exam conducted by Kelly Ellis, CNM, showed Nicole was 8 cm dilated, 100% effaced and the baby was at -1 station. At that time CNM Ellis artificially ruptured Nicole's membranes. A moderate amount of meconium stained fluid was noted at that time.

From 3:17 PM through 3:58 PM the fetal heart rate pattern showed evidence of placental insufficiency (early decelerations with a late return to baseline and/or late decelerations) that required CNM Ellis to consult with a physician.

By 3:58 PM Nicole was showing a pattern with persistent late decelerations that required CNM Ellis to consult with a provider that can perform a cesarean section. The labor had progressed outside of a normal labor and required physician consultation.

At 4:20 PM the fetal heart monitor indicated a baseline of 150 bpm with minimal to moderate variability and uterine contractions every 2 minutes with late decelerations with the majority of contractions. The fetal heart rate decelerated to 125 bpm over 1 minute with a gradual return to baseline. An oxygen mask was applied.

At 5:46 PM Nurse Andrus reviewed the position and technique for pushing. At 5:41 PM, Nicole was instructed to start pushing.

By 6:05 PM the fetal heart rate had a baseline of 145 bpm with no accelerations and late decelerations with almost all contractions.

Between 6:05 PM and 7:41 PM, there were persistent variables decelerations with the majority of contractions. The fetal heart rate baseline was recorded as anywhere between 145-170 bpm. At 6:20 PM there was a brief demonstration of baseline between 140-150. At 6:38 PM the fetal heart began demonstrating a progressively increasing baseline with overshoots.

2

At 7:08 PM there was a nursing shift change. Nurse Andrus handed off Nicole's bedside nursing care to Nurse Meghan Childs.

At 7:14 PM the fetal heart tracing demonstrated a baseline of 170 (Page 83). Nurse Childs was required to notify a physician and activate the chain of command to advocate for a Caesarean section.

At 7:30 PM the fetal heart tracing demonstrated persistent late decelerations which continued until delivery. By 7:37PM the fetal heart tracing is ominous.

At 7:42 PM tachysystole of greater than 5 contractions in 10 minutes was noted. There is no time on the fetal hear tracing where there is not a contraction for 30 seconds.

By 7:54 PM, Nicole's body temperature was 99.2 degrees. The fetal heart rate baseline was 180 bpm, which decreased to 150 bpm between uterine contractions.

At 8:07 PM, Dr. Mary Puttmann was called to the patient's bedside, where she and Kelly Ellis, CNM discussed the plan of care at 8:11 PM. They made the negligent decision to continue pushing instead of taking Nicole emergently to the operating room. By 8:20 PM, the fetal heart rate baseline was approximately 180 bpm with late onset decelerations to 100-120 bpm.

Nurse Childs noted the tachycardia and the decelerations were variable, however, because they occurred after every uterine contraction, they were in fact not variable. They are by definition late decelerations.

Shortly thereafter, at 8:34PM, Dr. Natasha Diaz and Dr. Mary Puttmann discussed the plan of care with Nicole. Finally it was then determined that a cesarean section was necessary.

Nicole was removed from the monitors and transported to the operating room. The fetal heart rate monitor was not reapplied in the operating room before surgery.

According to the operative report, Dr. Natasha Diaz suspected cephalopelvic disproportion and fetal intolerance to labor, and it was determined that baby _____ was in right occiput anterior (ROA) position. Rectal assistance for delivery of _____'s chin was attempted twice before a primary low transverse cesarean section was eventually performed. There was no fetal monitor tracing during this procedure. Attempting this barbaric rectal procedure without monitoring delayed the necessary Caesarean section. Prolonging this child's delivery without any monitoring is a violation of the standard of care. If CNM Ellis was present in the operating room when this procedure was attempted she was required to stop the unnecessary delay, advocate for immediate Caesarean section and get her patients monitored. The rectal procedure caused nothing but harm and delay to both mother and child.

3

When the rectal procedure failed, Nicole was placed under general anesthesia, and ' _____ ' was delivered at 9:10 PM. ____ __ 's Apgars were 2 at 1 minute, 5 at 5 minutes and 6 at 10 minutes. He had a cord PH of 7.0. validating that he suffered hypoxia in-utero.

As a result of the failure to deliver _____ ' by cesarean section earlier, he sustained severe and permanent brain damage and injuries related thereto.

It is my opinion that there is a reasonable and meritorious cause for filing an action against: 1) Linda Andrus, R.N. 2) Meghan Childs, R.N. and 3) Kelly Ellis, CNM

### Linda Andrus, R.N.

On January 4, 2014, Linda Andrus, R.N. was professionally negligent in the following ways:

    a)      failed to accurately assess fetal heart tracings;

    b)      failed to communicate abnormal fetal heart findings in a timely manner;

    c)      failed to properly assess fetal well-being;

    d)      failed to activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

    e)      failed to notify an physician of persistent late decelerations;

    f)      failed to recognize a hyper stimulated uterine contraction pattern;

    g)      failed to take action to reduce the frequency of uterine contractions;

    h)      failed to administer terbutaline; and

    i)      failed to activate the chain of command to advocate for a timely cesarean section.

### Meghan Childs, R.N.

On January 4, 2014, Meghan Childs, R.N. was professionally negligent in the following ways:

    a)      failed to accurately assess fetal heart tracings;

    b)      failed to communicate abnormal fetal heart findings in a timely manner;

    c)      failed to properly assess fetal well-being;

4

d)    failed to activate the chain of command to address a non-reassuring fetal heart and contraction pattern;

e)    failed to notify an physician of persistent late decelerations;

f)    failed to recognize a hyper stimulated uterine contraction pattern;

g)    failed to take action to reduce the frequency of uterine contractions;

h)    failed to administer terbutaline; and

i)    failed to activate the chain of command to advocate for a timely cesarean section.

## Kelly Ellis, CNM

On January 4, 2014, Kelly Ellis, CNM was professionally negligent in the following ways:

a)    failed to accurately assess fetal heart tracings;

b)    failed to recognize fetal distress;

c)    failed to appreciate the significance of non-reassuring strips;

d)    failed to notify the physician of an abnormal fetal heart rate tracing;

e)    failed to recognize a hyper stimulated uterine contraction pattern;

f)    failed to take action to reduce the frequency of uterine contractions;

g)    failed to administer terbutaline;

h)    failed to activate the chain of command to address a non-reassuring fetal heart and contraction pattern.

i)    failed to activate the chain of command to advocate for timely cesarean section;

j)    failed to object to rectal assistance procedure without monitoring and advocate for immediate cesarean delivery.

k)    failed to document from 15:25 through 23:30

My opinions are subject to modification pending review of further materials.

5